UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL JOHN OETZMAN,

                Plaintiff,        Civil Action No. 13-12831
                                     Honorable Patrick J. Duggan
                                     Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [13, 14]**

      Plaintiff Daniel John Oetzman ("Oetzman") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [13, 14], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.     RECOMMENDATION**

      For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Oetzman is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [14] be GRANTED, Oetzman's Motion for Summary Judgment [13] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision be AFFIRMED.

## II.    REPORT

### A.    Procedural History

On October 6, 2009, Oetzman filed applications for DIB and SSI, alleging a disability onset date of February 1, 2009.  (Tr. 116-26).  These applications were denied initially on January 21, 2010.  (Tr. 72-80).  Oetzman filed a timely request for an administrative hearing, which was held on December 14, 2011, before ALJ Anne Sharrard.  (Tr. 29-69).  Oetzman, who was represented by attorney Charles Robison, testified at the hearing, as did vocational expert Glee Ann Kehr.  (*Id.*).  On December 29, 2011, the ALJ issued a written decision finding that Oetzman is not disabled.  (Tr. 10-23).  On April 30, 2013, the Appeals Council denied review.  (Tr. 1-5).  Oetzman filed for judicial review of the final decision on June 28, 2013.  (Doc. #1).

### B.    Background

#### 1.    *Oetzman's Disability Reports and Testimony*

At the time of the administrative hearing, Oetzman was 53 years old.  (Tr. 34).  He testified that he completed a tool and die apprenticeship and worked in that field until he was "pushed out of the die business by a company that … used practices that weren't good for the worker."  (Tr. 36, 157).  In October of 2004, he began working in real estate, buying property and acting as a landlord.  (Tr. 36-37).  Oetzman testified that he enjoyed this work, but it got to the point, in February of 2009, that he was physically unable to perform it due to back and hip pain.  (Tr. 37, 152).  At one point, he owned fifty rental units, but by the time of the hearing, he was down to just five because it was physically difficult for him to even go to the apartments, let alone maintain them.  (Tr. 39-41).

Oetzman testified that he had a laminectomy in 1985, but he returned to work after this surgery and "worked 80 hours a week for years."  (Tr. 43-44, 155).  For the two-and-a-half years preceding the hearing, however, Oetzman spent most of his time in bed – "23 hours and 50

2

minutes a day if possible." (Tr. 38). He testified that "sitting, standing, and walking is misery" for him; he has to "hold [himself] up in order to keep the weight off of [his] disc." (Tr. 41). He testified that his back pain is "intense pain that you cannot function with," and he takes medication for that pain (he also admitted taking non-prescribed drugs that he acquires from "other patient friends"). (Tr. 52-53). Oetzman testified that he believes he needs back surgery again; however, it appears that his physicians disagree.[1] (Tr. 59).

Oetzman reported that his conditions affect his ability to lift, stand, walk, and complete tasks. (Tr. 164). In terms of his activities of daily living, Oetzman testified that he moved into his home in February of 2009 and, at the time of the hearing, still had not unpacked because he cannot stand, lift (anything heavier than groceries), or walk. (Tr. 45). Oetzman testified that he goes grocery shopping two or three times a month, but he leans on a shopping cart as he moves through the store. (Tr. 46-48, 162). He is able to make himself quick meals and do laundry, but he pays someone to help with the dishes and yard work. (Tr. 48-49, 161). He uses a cane at home and sometimes uses a walker when he leaves the house. (Tr. 46, 60).

### 2. *Medical Evidence*

On January 6, 2010, Oetzman underwent a consultative physical examination with Bharti Sachdev, M.D. (Tr. 236-38). Oetzman told Dr. Sachdev that he worked as a tool and die maker for 25 years and also managed at least 50 apartments during the past several years. (Tr. 236). He further indicated that "because of the recession," he lost all but nine of these apartments. (*Id.*). Oetzman reported that he moved eleven months earlier and, since that time, had been experiencing lower back pain. (*Id.*). He indicated that he felt "pressure" in his lower back with

---

[1] Somewhat inconsistently, Oetzman testified at one point that Dr. Kotecha suggested that surgery might be a possibility if he had health insurance, and at another point that Dr. Kotecha told him that he did not need back surgery. (Tr. 43, 59).

prolonged sitting or standing, which sometimes resulted in toe numbness.  (*Id.*).  Oetzman reported having had a laminectomy in 1985, from which he fully recovered.  (*Id.*).  On examination, Oetzman had negative straight leg raising tests, stable ambulation, and normal range of motion.  (Tr. 238).  He was able to get on and off the examination table and could squat and get up.  (*Id.*).  Dr. Sachdev described Oetzman's range of motion in his dorsolumbar spine as "pretty good," and indicated that he did not need an ambulatory aide.  (*Id.*).  Dr. Sachdev stated that most of Oetzman's issues "seem to be with anxiety" associated with his financial problems.  (*Id.*).  X-rays taken of Oetzman's lumbosacral spine that day showed only degenerative disc disease at L5-L6 and L6-S1.  (Tr. 239-40).

On February 2, 2010, Oetzman presented to Gregory Naylor, M.D. at the Center for Family Health to establish care.  (Tr. 366-67).  Oetzman complained of pain in his lower back and feet.  (Tr. 366).  On examination, he had lumbar spine tenderness.  (Tr. 367).  Dr. Naylor diagnosed lumbago, prescribed pain medication and a muscle relaxant, and ordered a lumbar spine MRI.  (*Id.*).  The MRI showed a mild disc bulge at L5-L6 with no evidence of disc herniation.  (Tr. 252-53).

Oetzman returned to see Dr. Naylor on March 2, 2010.  (Tr. 362-63).  Dr. Naylor again noted only lumbar spine tenderness and referred Oetzman to a pain clinic.  (Tr. 363).  Two weeks later, Oetzman returned to see Dr. Naylor, indicating that his back pain was interfering with his work as a landlord and requesting an "excuse for work."  (Tr. 360-61).  Dr. Naylor wrote a note stating that Oetzman could not work until April 26, 2010, which he later extended to an indefinite restriction on working.  (Tr. 254-55).

Oetzman returned to see Dr. Naylor on April 28, 2010, and June 8, 2010.  (Tr. 356-59).  During these two visits, the only examination finding was a single note that Oetzman had lumbar

4

spine tenderness.  (Tr. 357).  Lumbosacral spine x-rays performed in June of 2010 showed stable moderate degenerative disc disease at L5-L6 and to a lesser degree at L6-S1, and minimal dextroscoliosis.  (Tr. 289-90).

On June 23, 2010, Oetzman presented to Dr. Stanley Lee, a spine surgeon, with complaints of back pain radiating to his left leg.  (Tr. 338-39).  On examination, Oetzman was entirely normal, and Dr. Lee noted that there was "no evidence of bony fracture, instability or neurologic compression that would warrant additional consideration for surgery."  (Tr. 339).  Dr. Lee further noted that Oetzman "seemed very resistant accepting this opinion."  (*Id.*).  Dr. Lee recommended that Oetzman see a physiatrist who specialized in nonsurgical care, but Oetzman was again "very resistant in accepting this."  (*Id.*).  One month later, Oetzman returned to see Dr. Lee, at which point Dr. Lee indicated that his recommendation against surgery remained the same, as he did not believe that surgery would help Oetzman's symptoms.  (Tr. 337).

On July 20, 2010, Oetzman presented to Dr. Rose Johnson, who worked in Dr. Naylor's office.  (Tr. 353-55).  He complained of back pain and left shoulder pain and agreed to undergo physical therapy.  (*Id.*).  On September 1, 2010, Oetzman returned to see Dr. Naylor, who did not document any abnormalities and refilled Oetzman's medications.  (Tr. 350-51).

On September 7, 2010, Oetzman presented to Theresa Oney-Marlow, M.D., a physical medicine and rehabilitation specialist.  (Tr. 333-36).  Oetzman complained of pain in his lower back, feet, right hip, and left shoulder.[2]  (Tr. 333).  On examination, Oetzman had difficulty standing upright, and his left leg was longer than his right.  (Tr. 335).  He had a restricted range of motion of the lumbar spine, an antalgic gait, and was able to heel-toe walk and participate in tandem gait with difficulty.  (*Id.*).  Dr. Oney-Marlow stated that Oetzman did not have

_____

[2] Left shoulder x-rays performed that day revealed mild to moderate AC joint degenerative change.  (Tr. 287).

5

significant focal neurological deficits on examination, but she could not rule out the possibility of bilateral lumbosacral radiculopathy. (*Id.*). She recommended a number of non-surgical treatments – including manipulation, massage therapy, and injections – but Oetzman was "intent on surgery." (*Id.*). In light of this, Dr. Oney-Marlow advised Oetzman that he could seek a second opinion from another spine surgeon. (*Id.*).

Later that month, Oetzman presented to the emergency room at the University of Michigan with complaints of back pain. (Tr. 301-03). He reported getting only minimal relief with the medications prescribed by Dr. Naylor (Ultram and Flexeril) and admitted that he "usually gets relief from his pain by purchasing various opiate pain medications from associates." (Tr. 301). On examination, Oetzman had tenderness and a mild spasm in the bilateral lumbar soft tissue region and a somewhat diminished range of motion secondary to pain. (Tr. 302). Oetzman was prescribed a short course of opiates. (*Id.*).

Oetzman returned to see Dr. Oney-Marlow on October 18, 2010. (Tr. 329-31). On examination, he had some diminished leg reflexes, was using a rolling walker, and reported some tenderness to palpation over the left AC joint and with left shoulder maneuvers. (Tr. 330-31). Dr. Oney-Marlow diagnosed low back pain, left rotator cuff tendinopathy, left AC joint degenerative changes, right hip pain, leg length discrepancy, and chronic pain syndrome. (Tr. 331). She provided an injection to Oetzman's left shoulder and noted that Oetzman was still seeking a second opinion from a spine surgeon because he believed he needed surgery. (*Id.*).

On December 16, 2010, Oetzman again presented to Dr. Oney-Marlow, reporting that his symptoms were worse since his last visit, although the shoulder injection had helped him significantly. (Tr. 324-26). Dr. Oney-Marlow again suggested non-surgical management for his lower back pain, but Oetzman was still convinced that he needed surgery. (Tr. 326).

6

On February 15, 2011, Oetzman presented to Nilesh Kotecha, M.D. at the Great Lakes Brain and Spine Institute. (Tr. 256-58). He complained of low back pain that radiated down the left leg and indicated that he had been using a walker for one year. (Tr. 256). On examination, he had tenderness in the lower lumbar region, decreased active range of motion, and an absent Achilles reflex, but no other abnormalities. (Tr. 257-58). Dr. Kotecha referred Oetzman for physical therapy. (Tr. 258).

Two days later, Oetzman presented to Nurse Practitioner Cynthia Warden in Dr. Naylor's office. (Tr. 399-401). He reported lower back pain radiating to his left calf. (Tr. 399). No abnormalities were documented on examination, and Nurse Warden managed Oetzman's medications (including opiates). (Tr. 400-01).

On March 16, 2011, Oetzman presented to Iman Abou-Chakra, M.D., who worked with Dr. Oney-Marlow. (Tr. 321-22). He continued to have an antalgic gait and used a walker. (Tr. 321). He told Dr. Abou-Chakra that Dr. Lee did not believe surgery was appropriate, but further stated that he was "currently pending lumbar surgery as soon as he has insurance by Dr. Kotecha." (*Id.*). On examination, Oetzman had a significant range of motion restriction in the lower back area with mild flattening of the lumbar lordosis. (Tr. 321). Dr. Abou-Chakra diagnosed postlaminectomy syndrome with chronic low back pain; degenerative disc disease at L6-S1 and laminectomy at L5-L6; left shoulder impingement syndrome; leg length discrepancy; and chronic pain syndrome. (Tr. 322). Dr. Abou-Chakra stated that all of these conditions were stable with the exception of mild deconditioning and recommended physical therapy.[3] (*Id.*).

On May 16, 2011, Oetzman returned to see Dr. Abou-Chakra, reporting that his symptoms had worsened with physical therapy. (Tr. 319-20). Dr. Abou-Chakra indicated that

---

[3] Oetzman attended six physical therapy sessions and was discharged in April 2011. (Tr. 266).

Oetzman had "failed and exhausted all conservative treatment" and was still demonstrating the "aberrant behavior" of purchasing various opiate medications off the street. (Tr. 319). On examination, he had limited range of motion in his left shoulder and low back. (*Id.*). Dr. Abou-Chakra recommended that Oetzman be referred to a comprehensive pain management center, where he could "get his pain addressed in addition to the behavioral issue, in order to avoid any risk of addiction or illicit drug use." (Tr. 320).

Oetzman presented to Nurse Warden on four occasions between June and October of 2011, apparently for medication management. (Tr. 378-80, 384-92). In June and July, Oetzman had spine tenderness and muscle spasms, but normal ranges of motion. (Tr. 388, 391). In October, Oetzman told Nurse Warden that he was "waiting to get surgery per Dr. Kotecha" once he received disability benefits. (Tr. 380). And, in November of 2011, Oetzman presented to Shahzad Shaikh, M.D. in Dr. Naylor's office. (Tr. 376-77). Dr. Shaikh noted that Oetzman's prior MRI did not show any disc herniation and his examination was "fairly benign." (Tr. 377).

On November 3, 2011, Oetzman returned to see Nurse Warden with paperwork to complete. (Tr. 373-75). An examination performed that day was normal except for spine tenderness. (Tr. 374). Nevertheless, Nurse Warden completed a Medical Source Statement (also signed by Dr. Naylor), in which she opined that Oetzman's symptoms were so severe that he was *constantly* impaired in terms of staying on task and had a marked limitation in dealing with work stress. (Tr. 341). She said that he could not walk without rest or severe pain; needed a walker; could not sit or stand for any amount of time; needed to sit in a way that kept weight off his spine; and could sit and stand/walk for less than two hours in an eight-hour work day. (*Id.*). Nurse Warden further indicated that Oetzman could occasionally lift ten pounds and was likely to be absent from work more than three times a month. (Tr. 342-43). She further opined that

Oetzman was "currently unable to work."  (Tr. 342).

### 3.    *Vocational Expert's Testimony*

Glee Ann Kehr testified as an independent vocational expert ("VE") at the administrative hearing before the ALJ.  (Tr. 61-68).  First, the VE testified that Oetzman's prior employment as a landlord was effectively a combination of two jobs listed in the Dictionary of Occupational Titles ("DOT") – supervisor of building maintenance and leasing agent.  (Tr. 63).  The ALJ then asked the VE to imagine a claimant of Oetzman's age, education, and work experience, who could perform light work, except that he would require a hand-held assistive device for uneven terrain or prolonged ambulation; could frequently push and pull; and could occasionally climb, balance, stoop, crouch, crawl, and kneel.  (Tr. 63-64).  The VE testified that the hypothetical individual would be capable of performing the "leasing agent" portion of Oetzman's past relevant work, but not the "building manager" component.  (Tr. 64).  In addition, the VE testified that the hypothetical individual would be capable of working as an office helper (3,700 jobs in the state of Michigan), information clerk (18,500 jobs), and mailroom clerk (3,200 jobs).  (Tr. 64-65).  The ALJ then asked the VE whether her answers would change if the hypothetical individual was off task for 10% of the day due to pain, and she testified they would not.  (Tr. 65).

### C.    Framework for Disability Determinations

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be

determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:   If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920).  "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

> **D.    The ALJ's Findings**

Following the five-step sequential analysis, the ALJ found that Oetzman is not disabled under the Act.  At Step One, the ALJ found that Oetzman has not engaged in substantial gainful activity since February 1, 2009, the alleged onset date.  (Tr. 12).  At Step Two, the ALJ found that Oetzman has the severe impairments of degenerative disc disease, sciatica to the left foot, and chronic lumbago.  (*Id.*).  At Step Three, the ALJ found that Oetzman's impairments do not meet or medically equal a listed impairment.  (Tr. 12-13).

10

The ALJ then assessed Oetzman's residual functional capacity ("RFC"), concluding that he is capable of performing light work, except that he requires a hand-held assistive device for uneven terrain or prolonged ambulation; can frequently push and pull; can only occasionally climb, balance, stoop, crouch, crawl, and kneel; and will be off task 10% of the time due to pain. (Tr. 13-21).

At Step Four, the ALJ determined that Oetzman is capable of performing his past relevant work as a leasing agent. (Tr. 21-22). In the alternative, however, the ALJ concluded at Step Five, based in part on the VE's testimony, that Oetzman is capable of performing a significant number of jobs that exist in the national economy. (Tr. 22-23). As a result, the ALJ concluded that Oetzman is not disabled under the Act. (Tr. 23).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)

(internal quotations omitted).   In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."   *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.   *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).   The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.   *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2011); *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).   There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.   *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).   If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."   *Cutlip v. Sec'y of Health & Human Servs.*, 25 -F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F.    Analysis

In his motion for summary judgment, Oetzman argues that the ALJ erred in (1) failing to give controlling weight to the November 2011 opinion of his primary treatment providers, Nurse Warden and Dr. Naylor; (2) failing to adequately assess the credibility of his subjective complaints; and (3) failing to consider the functional limitations caused by his alleged obesity.

(Doc. #13 at 18-29).  Each of these arguments will be discussed in turn.

> 1.   *The ALJ Gave "Good Reasons" for Discounting the*
> *November 2011 Opinion of Nurse Warden/Doctor Naylor*

As set forth above, on November 3, 2011, Nurse Warden completed a Medical Source Statement (also signed by Dr. Naylor), in which she opined as to Oetzman's physical impairments and limitations ("the Warden/Naylor opinion").  (Tr. 340-43).  Nurse Warden indicated that Oetzman suffered from degenerative disc disease at L5-L6 and L6-S1, a diffuse disc bulge at L5-L6, and sciatica to his left foot.  (Tr. 340).  She rated Oetzman's prognosis as "poor," but the only "clinical findings and objective signs" listed were status post-laminectomy in 1985.  (*Id.*).  Nurse Warden further indicated that Oetzman's symptoms were so severe that he was "constantly (100%)" impaired in terms of remaining on task in a competitive work environment, and he had a "marked limitation (75%)" in his ability to deal with work stress.  (Tr. 341).  She said that he could not walk at all without rest or severe pain; needed a walker; could not sit or stand for any amount of time; needed to sit in a way that kept weight off his spine; and could sit and stand/walk for less than two hours in an eight-hour workday.  (*Id.*).  Nurse Warden further indicated that Oetzman could lift ten pounds occasionally but was likely to be absent from work more than three times a month.  (Tr. 342-43).  She further opined that Oetzman was "currently unable to work."  (Tr. 342).  In reaching his conclusion that Oetzman can perform a reduced range of light work, the ALJ expressed significant concerns about the Warden/Naylor opinion and ultimately gave it "little weight."  (Tr. 19-20).  Oetzman asserts that the ALJ erred in this respect.

An ALJ "'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'"  *Blakley v.*

13

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).   While treating source opinions are entitled to controlling weight under such circumstances, it is "error to give an opinion controlling weight simply because it is the opinion of a treating source" unless it is well-supported and consistent with the record as a whole.  *Soc. Sec. Rul.* 96-2p, 1996 WL 374188, at *2 (July 2, 1996); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("Treating physicians' opinions are only given such deference when supported by objective medical evidence.").

If the ALJ declines to give a treating physician's opinion controlling weight, he must document how much weight he gives it, "considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakley*, 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544); *see also* 20 C.F.R. §§404.1527(c), 416.927(c).  However, an ALJ is not required to discuss each of these factors in order to satisfy the treating source rule.  *See Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that the regulations "expressly require only that the ALJ's decision include 'good reasons'" for the weight given to the treating source's opinion, "not an exhaustive factor-by-factor analysis").

In this case, the ALJ first expressed concerns regarding how involved Dr. Naylor was in preparing the Warden/Naylor opinion, indicating that, "Ms. Warden, a nurse practitioner, provided the analysis and Dr. Naylor only signed it."  (Tr. 19).  Oetzman does not dispute this conclusion.[4]  The authorship of this opinion was important because, if the opinion was Nurse

---

[4] Moreover, if Dr. Naylor had prepared the form himself, the basis for the opinions expressed therein would be somewhat suspect, as he had not actually examined Oetzman since November of 2010, one year before the opinion at issue was provided.  (Tr. 19 (citing Tr. 347-49)).

Warden's work product, it would be entitled to less deference than if it was provided by Dr. Naylor.  As the ALJ points out, a nurse practitioner, such as Nurse Warden, is not an "acceptable medical source."  *See* 20 C.F.R. §§404.1513(a), 416.913(a).  Only "acceptable medical sources" can give "medical opinions" within the meaning of the applicable regulations.  Thus, if the opinion was Nurse Warden's – as opposed to Dr. Naylor's – it would not necessarily be entitled to controlling weight pursuant to the treating source rule, even if it was well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record.  *See* 20 C.F.R. §§404.1527(a)(2), 416.927(a)(2).

Even assuming that the treating source rule applies, however, the ALJ explicitly noted – in assigning little weight to the Warden/Naylor opinion – that their "own treatment notes and physical findings fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact as limited as reported."  (Tr. 19).  This was an appropriate consideration.  *See* 20 C.F.R. §§404.1527(c)(3), 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.").  Specifically, the ALJ noted that although the Warden/Naylor opinion indicated that Oetzman was unable to sit or stand for any amount of time (Tr. 341), the providers' own physical findings – from an examination conducted *the very day the form was completed* – indicated only posterior tenderness, with full range of motion in the lumbar spine.  (Tr. 19 (citing Tr. 372-74).  Indeed, Oetzman presented to either Nurse Warden or Dr. Naylor on at least fourteen occasions between February of 2010 and November of 2011.   (Tr. 347-52, 356-63, 366-67, 373-75, 378-80, 384-92, 396-401).   On virtually all of these occasions, on physical examination, the treatment providers documented either no abnormalities or found only lower back tenderness.  (Tr. 348, 351, 357, 358-59, 361,

15

363, 367, 374, 379, 385, 388, 397, 400).[5]  Given that the Warden/Naylor opinion stated that Oetzman was profoundly limited (indeed, essentially bedridden), it is certainly reasonable to expect that they would have reported more significant examination findings.  The lack of evidence reasonably led the ALJ to suggest that Nurse Warden and Dr. Naylor "relied quite heavily on the subjective report of the symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported."  (Tr. 19-20).  Courts have recognized that where a doctor's opinion is based largely on the claimant's subjective complaints, as opposed to objective medical evidence, it need not be given controlling weight.  *See Mitchell v. Comm'r of Soc. Sec.*, 330 F. App'x 563, 569 (6th Cir. 2009) ("A doctor's report that merely repeats the patient's assertions is not credible, objective medical evidence and is not entitled to the protections of the good reasons rule."); *Williams v. Astrue*, 2010 WL 503140, at *8 (E.D. Tenn. Feb. 8, 2010) (an opinion based largely on the claimant's self-reporting is entitled to minimal weight).

The ALJ also discounted the Warden/Naylor opinion because it was without support from the other evidence of record, and because the treatment recommended by Oetzman's physicians was not consistent with what one would expect if he were truly disabled.  (Tr. 20).  Again, these were valid considerations.  *See* 20 C.F.R. §§404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.").  Oetzman's treatment was almost entirely conservative, consisting of medication management and physical therapy.  Dr. Oney-Marlow, for example, indicated that although Oetzman was "intent on surgery," she recommended a number of non-surgical treatments instead, including manipulation, massage therapy, and injections.  (Tr. 335).  Indeed, neither of

---

[5] On one occasion, in June 2011, Nurse Warden also found evidence of muscle spasm.  (Tr. 391).

the spine surgeons Oetzman saw recommended surgery.  (Tr. 258, 339).  It is reasonable to expect that if Oetzman had the type of debilitating symptoms alleged, much more aggressive treatment would have been recommended and received.

In his brief, Oetzman asserts that all of the treating physicians "found pathology that at least reduced [his] work capacity to less than sedentary – not light as found by the ALJ."  (Doc. #13 at 22).  However, Oetzman does not point to any specific medical records in which such findings are located.  Elsewhere in his brief, he points to certain "observations" made by treating physicians, which he believes are inconsistent with the ALJ's finding that he could perform light work.[6]  (Doc. #13 at 19-20).  However, only one treatment note identified by Oetzman – from a visit to Dr. Oney-Marlow on December 16, 2010 – can be construed as containing objective medical evidence.[7]  It indicates that Oetzman has an antalgic gait pattern, and diminished left patellar and right Achilles reflexes.  (Tr. 325).  Oetzman has not shown that this single treatment note undermines the ALJ's decision, particularly where, at the same visit, Dr. Oney-Marlow advised Oetzman only to use ice and pain medication and did not recommend more aggressive treatment.  (Tr. 326).  For all of these reasons, the ALJ's decision to give the Warden/Naylor opinion little weight is supported by substantial evidence.

---

[6] Oetzman also asserts that the consultative examiner, Dr. Sachdev, observed that he had "pressure in his low back on prolonged standing and sitting at which time he feels numbness in the toes of both feet, not related to bending or turning."  (Doc. #13 at 19 (citing Tr. 236)).  As the Commissioner correctly points out, however, Oetzman's assertion is misleading, as the statement he quotes was not actually an observation of Dr. Sachdev but, rather, Oetzman's own subjective complaints to the doctor.  (Tr. 236).

[7] Indeed, most of the doctors' notes referenced by Oetzman contain mere diagnoses (of degenerative disc disease, left shoulder pain, right hip pain, etc.).  (Tr. 261, 325-26).  However, "the mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual."  *McKenzie v. Comm'r of Soc. Sec.*, 2000 WL 687680, at *5 (6th Cir. May 19, 2000).

2.    *The ALJ's Credibility Determination*
*is Supported by Substantial Evidence*

Oetzman also argues that the ALJ erred in finding his allegations of disabling limitations less than fully credible.  As the Sixth Circuit has held, determinations of credibility related to subjective complaints of pain rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'"  *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)).  Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record.  *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997).  Rather, when a complaint of pain or other symptom is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the alleged symptoms, he must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians … and any other relevant evidence in the case record" to determine if the claimant's claims regarding the severity of his symptoms are credible.  *Soc. Sec. Rul.* 96-7, 1996 WL 374186, at *1 (July 2, 1996); *see also* 20 C.F.R. §§404.1529, 416.929.

In this case, after finding at Step Two that Oetzman has the severe impairments of degenerative disc disease, sciatica to the left foot, and chronic lumbago (Tr. 12), the ALJ concluded that Oetzman has the residual functional capacity to perform a reduced range of light work (Tr. 13-21).  In doing so, the ALJ found that while Oetzman's conditions could reasonably be expected to produce the alleged symptoms, his statements about the intensity, persistence and limiting effects of those symptoms were not entirely credible to the extent they conflicted with

18

the RFC assessment.  (Tr. 15).  In reaching this conclusion, the ALJ specifically considered the objective medical evidence, as well as inconsistencies in Oetzman's statements and testimony, and he gave good reasons for discrediting Oetzman's allegations of work-preclusive limitations. (Tr. 13-21).

In terms of the medical evidence, the ALJ noted that despite Oetzman's allegations of disabling back pain, a lumbar spine MRI performed in February of 2010 showed only a mild disc bulge at L5-L6 with no evidence of disc herniation.  (Tr. 16 (citing Tr. 252-53)).  Similarly, x-rays of Oetzman's lumbar spine performed in both January and July of 2010 showed only degenerative disc disease at L5-L6 and L6-S1.  (Tr. 15-16 (citing Tr. 239-40, 289-90)).  In addition to these relatively mild diagnostic imaging results, the ALJ also properly considered the fact that clinical examinations did not typically reveal any significant abnormalities.  For example, Dr. Naylor and Nurse Warden saw Oetzman fourteen times over a nearly-two-year period, yet they consistently documented either no abnormalities or found only lower back tenderness.  (Tr. 348, 351, 357, 358-59, 361, 363, 367, 374, 379, 385, 388, 397, 400).  Thus, the ALJ reasonably found that Oetzman's subjective complaints were not borne out by the objective medical evidence.

In addition, the ALJ found Oetzman's allegations of disabling limitations less than fully credible because he had not "generally received the type of medical treatment one would expect for a totally disabled individual."  (Tr. 18).  For example, the ALJ noted that although Oetzman's alleged onset date was February 1, 2009, he did not start seeking treatment until one year later, in February of 2010.  (*Id.*).  This was a valid consideration.  *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or

19

treatment.  A failure to do so may cast doubt on a claimant's assertions of disabling pain."). Additionally, as discussed in greater detail above, the ALJ noted that Oetzman's treatment was largely conservative in nature, consisting primarily of medication management and a brief course of physical therapy.  (Tr. 18).  This too was a valid consideration.  *See Jennings v. Comm'r of Soc. Sec.*, 2011 WL 7025815, at *7 (E.D. Mich. Oct. 31, 2011) (ALJ properly considered conservative nature of claimant's treatment in discrediting his testimony regarding the intensity, persistence and limiting effects of his pain).

In evaluating Oetzman's credibility, the ALJ also noted several inconsistencies in his representations, which undercut his credibility.  For example, the ALJ noted that Oetzman "provided conflicting information about his work and activities of daily living," testifying that he spends more than 23 hours per day bedridden – keeping a urinal beside his bed because he cannot even walk to the restroom – but acknowledging that he still manages five apartments (collecting rent, going to court to evict tenants when necessary, etc.).  (Tr. 21, 38-39).  The ALJ also noted that Oetzman's statements were inconsistent with respect to whether Dr. Kotecha recommended surgery.  (Tr. 21).  As the ALJ noted, Oetzman first testified that Dr. Kotecha did not think he would need surgery; later on in the hearing, however, Oetzman testified that Dr. Kotecha had suggested surgery as an option if he could pay for it.  (Tr. 21, 43, 59).  And, Oetzman told various doctors that Dr. Kotecha was going to perform back surgery on him, despite the fact that Dr. Kotecha's records clearly indicate that he never recommended surgery but, instead, referred him to physical therapy.  (Tr. 21, 258, 321, 380).  The ALJ's determination that these significant inconsistencies undermined Oetzman's credibility is supported by substantial evidence.

In his brief, Oetzman does not challenge any of the reasons articulated by the ALJ for

finding him less than fully credible; rather, he identifies a few discrete matters purportedly bearing on his credibility that he believes the ALJ failed to consider. (Doc. #13 at 26-27). Specifically, Oetzman argues that the ALJ erred in not considering his "persistent efforts to obtain pain relief" and his "long and desperate efforts to retain his capacity to work. (*Id.* at 26). To the contrary, however, the ALJ did discuss Oetzman's "efforts to obtain pain relief," finding that he was not entirely compliant in taking prescribed pain medications and admittedly bought narcotic medication off the street because his treating doctors would not prescribe it. (Tr. 21). And, as discussed above, the ALJ noted that although Oetzman's alleged onset date was February 1, 2009, he did not start seeking treatment until one year later, in February of 2010. *Supra* at 19. The ALJ also considered Oetzman's work record. (Tr. 14, 21). Simply because Oetzman disagrees with the conclusions the ALJ drew regarding his credibility from these matters does not mean that the ALJ erred. Oetzman also argues that the ALJ erred by ignoring the affidavit submitted by his sister, Suzanne Yarbrough, concerning his functional abilities. (Doc. #13 at 26-27 (citing Tr. 224-25)). Although Oetzman asserts that his sister's affidavit supports his "often seen pain and physical limitations" (*Id.* at 27), it does not necessarily demonstrate that he was more limited than found by the ALJ. Moreover, an ALJ need not mention every piece of evidence in the record in rendering his decision. *See Kornecky*, 167 F. App'x at 508 ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party").

In sum, the ALJ recognized the duty imposed upon him by the regulations and, in addition to Oetzman's own subjective complaints, properly considered the objective medical evidence, as well as inconsistencies in Oetzman's statements and testimony, in evaluating his credibility. Thus, Oetzman has not shown compelling reasons for disturbing the ALJ's

credibility determination, which must stand.  *Smith*, 307 F.3d at 379..

### 3. *Oetzman Has Not Shown that the ALJ Committed Reversible Error with Respect to Considering His Obesity*

Oetzman next argues that he was obese and that the ALJ erred in not considering the effects of that condition.  (Doc. #13 at 27-29).  According to Oetzman, he weighs 225 pounds and has a body mass index ("BMI") of 30.5, with a BMI of 30.0 or above evidencing obesity.  (*Id.* at 27-28 (citing *Soc. Sec. Rul.* 02-1p, 2000 WL 628049 (Sept. 12, 2002)).  Oetzman further argues that if a claimant "is limited in any way by the medically determinable impairment obesity, then those limitations must be considered in assessing RFC."  (*Id.* at 28.)

Social Security Ruling 02-1p provides guidance for evaluating the impact of obesity on other physical and mental conditions.  *See Soc. Sec. Rul. 02-1p*, 2000 WL 628049 (Sept. 12, 2002).  It recognizes obesity as "a risk factor" that increases an individual's chances of developing impairments and notes that obesity often complicates chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems.  *Id.* at *3.  However, the Ruling further provides that the Commissioner "will not make assumptions about the severity or functional effects of obesity combined with other impairments.  Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment.  [The Commissioner] will evaluate each case based on the information in the case record."  *Id.* at *6.

In this case, although Oetzman asserts that the ALJ must "accept a diagnosis of obesity given by a treating source or by a consultative examiner" (Doc. #13 at 27), he cites no evidence that he ever received such a diagnosis, and the Court has not uncovered any.  In *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011), the Sixth Circuit held that obesity can only be considered where it is actually raised by the claimant.  Here, just as in *Reynolds*:

> [Oetzman] did not put [his] obesity at issue in the proceedings below:  [he] did not list obesity as one of [his] impairments, or list it as one of [his] difficulties on any paperwork put before the various levels of review.  More importantly, [he] did not present evidence from any physician that described [him] as obese, much less gave an opinion that [his] weight imposed additional limitations upon [him] or exacerbated [his] other conditions.  Therefore, even if [Oetzman's] silence on the issue of obesity is not deemed to waive consideration of that issue, it does not appear that evidence existed regarding [his] obesity that the ALJ should have considered.

*Id.* at 416.  In this case, then, where Oetzman has offered virtually no evidence concerning his alleged obesity, and has not identified any evidence showing that he has functional limitations due to this condition, the ALJ did not err in not discussing Oetzman's alleged obesity.  *See, e.g., Finch v. Comm'r of Soc. Sec.*, 2008 WL 4449857, at *9 (E.D. Mich. Sept. 30, 2008) ("an ALJ's failure to consider the effects of alleged obesity is not error where the record supports the ALJ's decision or where the medical evidence does not reveal that obesity caused or exacerbated any functional limitations").

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

## III.    CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [14] be GRANTED, Oetzman's Motion for Summary Judgment [13] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: May 31, 2014                          s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge


## NOTICE

The  parties  to  this  action  may  object  to  and  seek  review  of  this  Report  and

Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 31, 2014.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
